OPINION
VOROS, Judge:
¶ 1 Shawnna Rae Cope appeals the trial court's grant of summary judgment in favor of Utah Valley State College (UVSC).[1] We affirm in part and reverse in part and remand for further proceedings.
BACKGROUND
¶ 2 In 2005, Cope was a member of the UVSC Ballroom Dance Tour Team. On September 21, 2005, Cope was injured when she fell while practicing a lift with another team member (Partner). Cope's instructor (Instructor) was supervising the team's rehearsal at the time of the injury. Before the injury occurred, Instructor stopped the rehearsal to have some couples demonstrate the lift and Instructor then worked with each couple individually on the lift Instructor realized that Cope and Partner were doing the lift incorrectly. Partner was supposed to lift Cope from his right side over his left shoulder but had been lifting her over his right shoulder. Partner told Instructor, "I've never been able to get this lift well." Executing the lift over the left shoulder was more difficult than executing it over the right shoulder because it required greater strength and momentum to get Cope from Partner's right side across his body and over his left shoulder. Instructor warned Cope and Partner, " '[E]ither you guys do this or we are going to cut [the lift from the routine]'" Cope testified in her deposition that she considered the lift "the coolest lift [they] had been doing" in the routine. When Cope and Partner attempted the lift over the left shoulder, Partner lost his footing and Cope fell, hitting her head on Partner's knee and suffering injury.
*317 ¶ 3 In her deposition, Cope testified that she had never danced with Partner before the day of her injury. However, UVSC provided the trial court with a video taken sometime during the week preceding Cope's injury in which she and Partner were recorded practicing the lift together three times, always over the incorrect shoulder.
¶ 4 According to Cope's expert, executing the lift over the left shoulder when Cope and Partner had been practicing it over the right shoulder was at least as difficult and dangerous, if not more so, than attempting an entirely new lift.[2] She explained that it was the standard in the industry for dancers to use spotters when learning new lifts. She also opined that Instructor should have used spotters on the lift to decrease the risk of injury until the students indicated that they were comfortable with the lift and Instructor determined that they were competent at performing it. Instructor believed that because Cope and Partner were capable of performing the lift over the right shoulder, no spotters were needed when they practiced the lift over the left shoulder.
¶ 5 Cope filed a complaint against UVSC on August 14, 2006. Following discovery, UVSC filed a motion for summary judgment on July 29, 2010, arguing that the alleged facts were insufficient to establish that it had a special relationship with Cope that gave rise to a duty of care. The trial court denied the motion. UVSC renewed its motion on December 20, 2010, based on the video evidence showing that Cope and Partner had practiced the lift together, albeit incorrectly, on at least one occasion prior to the date of Cope's injury. In light of this evidence, the trial court revised its earlier decision. It determined that Cope, aware of the couple's prior difficulty in performing the lift, nevertheless accepted the risk of continuing to attempt it rather than have the "'coolest' part of the routine" eut. The trial court concluded that because Instructor gave Cope the option of either learning the lift correctly or having it eut from the routine, Cope could have elected not to do the difficult lift without further consequence and thereby avoided her injury. Accordingly, the trial court concluded that no special relationship arose and that Instructor thus owed Cope no duty of care.
ISSUES AND STANDARDS OF REVIEW
¶ 6 Cope first contends that the trial court abused its discretion by reconsidering its original denial of UVSC's motion for summary judgment. "A trial court's decision to grant or deny a motion to reconsider summary judgment is within the discretion of the trial court, and we will not disturb its ruling absent an abuse of discretion." Timm v. Dewsnup, 921 P.2d 1381, 1386 (Utah 1996) (emphasis omitted).
¶ 7 Cope also contends that the trial court erred in granting UVSC's motion for summary judgment because a special relationship existed between Cope and Instructor. Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "We review a trial court's order granting summary judgment for correct ness," viewing "all facts and inferences in the light most favorable to the nonmoving party." Mountain West Surgical Ctr., LLC v. Hospital Corp. of Utah, 2007 UT 92, ¶ 10, 173 P.3d 1276.
ANALYSIS
I. Reconsideration of Motion for Summary Judgment
¶ 8 Cope contends that the trial court erred by reconsidering its original denial of UVSC's motion for summary judgment. Cope's argument relies on rule 60(b) of the Utah Rules of Civil Procedure. That rule permits a trial court to "relieve a party ... from a final judgment" based on "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." See Utah R. Civ. P. 60(b), (b)(@2). Cope reasons that the video of Cope and Partner rehears *318 ing in the week prior to the accident, the discovery of which formed the basis for UVSC's motion to reconsider, was not evidence that "by due diligence could not have been discovered," id., prior to the original motion for summary judgment and that the trial court therefore abused its discretion by reconsidering its earlier ruling.
¶ 9 However, the relevant rule here is not rule 60(b). Rule 60(b) governs the reconsideration of final orders, and the trial court's denial of UVSC's motion for summary judgment was not a final order. The relevant rule is rule 54(b). "Rule 54(b) of the Utah Rules of Civil Procedure ... allows a court to change its position with respect to any order or decision before a final judgment has been rendered in the case." Trembly v. Mrs. Fields Cookies, 884 P.2d 1306, 1310 n. 2 (Utah Ct.App.1994). Rule 54(b) states, "Any order ... that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties ... is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Utah R. Civ. P. 54(b). While UVSC did present its motion to reconsider as a rule 60(b) motion based on newly discovered evidence, "the substance, not caption, of a motion is dispositive in determining the character of the motion," see Trembly, 884 P.2d at 1310 n. 2. UVSC's motion was, in substance, simply a rule 54(b) motion to reconsider a non-final order, and thus the trial court had the prerogative to reconsider and revise its prior ruling on the motion for summary judgment. Accordingly, we affirm the trial court on this point.
II. Special Relationship
¶ 10 We next consider whether the trial court erred in determining that UVSC owed no duty of care to Cope on the ground that no special relationship existed between Cope and Instructor. "The issue of whether a duty exists is entirely a question of law to be determined by the court." Ferree v. State, 784 P.2d 149, 151 (Utah 1989).
¶ 11 "Duty must be determined as a matter of law and on a categorical basis for a given class of tort claims." B.R. ex rel. Jeffs v. West, 2012 UT 11, ¶ 23, 275 P.3d 228. Duty determinations should be expressed in "relatively clear, categorical, bright-line rules of law applicable to a general class of cases." Id. (citation and internal quotation marks omitted). For example, Jeffs considered "the existence of a duty on the part of healthcare providers to exercise reasonable care in prescribing medications that pose a risk of injury to third parties." Id. ¶ 22. The Utah Supreme Court held that "the duty question does not turn on the specific combination of pharmaceuticals that [the nurse practitioner] prescribed or the particular injury that it allegedly caused. Rather, the duty analysis considers healthcare providers as a class, negligent prescription of medication in general, and the full range of injuries that could result in this class of cases." Id. ¶ 23. "Thus," the court concluded, the nurse practitioner "would owe no duty to appellants only if there were no duty for the whole class of healthcare providers in these general circumstances." Id. The court expressed no opinion on whether the nurse practitioner breached her duty of care, or whether any such breach proximately caused the plaintiffs' damages.
¶ 12 When governmental actors are involved, special considerations apply to a duty analysis. "As a matter of public policy, we do not expose governmental actors to tort liability for all mishaps that may befall the public in the course of conducting their duties." Webb v. University of Utah, 2005 UT 80, ¶ 11, 125 P.3d 906. The public duty doctrine limits a governmental actor's duty to situations where a special relationship exists between the government and specific individuals:
The public duty doctrine provides that although a government entity owes a general duty to all members of the public, that duty does not impose a specific duty of due care on the government with respect to individuals who may be harmed by governmental action or inaction, unless there is some specific connection between the government agency and the individuals that makes it reasonable to impose a duty.
Day v. State ex rel. Utah Dep't of Pub. Safety, 1999 UT 46, ¶ 12, 980 P.2d 1171 (cita *319 tions omitted). Thus, a government actor owes no specific duty of care to the undifferentiated general public, but only to those persons "who stand so far apart from the general public that we can describe them as having a special relationship to the governmental actor." Webb, 2005 UT 80, ¶ 11, 125 P.3d 906; see also Higgins v. Salt Lake County, 855 P.2d 231, 236-39 (Utah 1993). A number of circumstances may indicate that an individual or distinct group stands sufficiently apart from the general public to create a special relationship, including "governmental actions that reasonably induce detrimental reliance by a member of the public" or a distinct group. See Day, 1999 UT 46, ¶ 13, 980 P.2d 1171 (identifying "(alt least four circumstances [that] may give rise to a special relationship between the government and specific individuals"); Higgins, 855 P.2d at 238-40 (recognizing that special relationships may extend to members of a distinct group).
¶ 13 Under Jeffs, the scope of a special relationship is determined on a categorical level, applicable to a general class of cases. See 2012 UT 11, ¶ 23, 275 P.3d 228. But "whether a special relationship exists depends upon a careful evaluation of the facts." Wilson v. Valley Mental Health, 969 P.2d 416, 419 (Utah 1998). The facts determine whether a particular case falls into a general class of cases where a special relationship exists. See id. at 418-20 (identifying a general class of cases where a special relationship exists and discussing the facts to determine whether the case falls into that category); Higgins 855 P.2d at 237-39 (same); Rollins v. Petersen, 813 P.2d 1156, 1162 (Utah 1991) (same); Ferree, 784 P.2d at 151-52 (same); Beach v. University of Utah, 726 P.2d 413, 415-16 (Utah 1986) (same); Jenkins v. Jordan Valley Water Conservancy Dist., 2012 UT App 204, ¶¶ 29-32, 283 P.3d 1009 (same). But see Cruz v. Middlekauff Lincoln-Mercury, Inc., 909 P.2d 1252, 1255-56 (Utah 1996) (suggesting that the duty analysis may turn on consideration of "special cireumstances" unique to the facts of each case). Although disputed facts relevant to the special relationship inquiry should be resolved by the factfinder, see Normandeau v. Hanson Equip., Inc., 2009 UT 44, ¶ 21, 215 P.3d 152, whether the facts of a particular case place that case within a special relationship category is a matter of law for the court to decide, see Ferree, 784 P.2d at 151.
¶ 14 University personnel do not generally have a special relationship with students. Webb, 2005 UT 80, ¶ 19, 125 P.3d 906 (citing Freeman v. Busch, 349 F.3d 582, 587 (8th Cir.2003)). However, in Webb, our supreme court implicitly recognized a category of eases where a special relationship arises in the university setting. The possibility that a special relationship can be created follows from the fact that "a college student will inevitably relinquish a measure of behavioral autonomy to an instructor out of deference to her superior knowledge, skill, and experience." Id. ¶ 24. The court observed that students-even college students-"want to please their instructors. They want to sue ceed in their studies. They believe that the instructors have command of the subject matter and the environment in which it is taught." Id. ¶ 26. These factors may cause a student to abandon her own "internal signals of peril" and to rely detrimentally on her instructor. Id. ¶¶ 26-27; see also Beach, 726 P.2d at 415-16 ("The essence of a special relationship is dependence by one party upon the other or mutual dependence between the parties.").
¶ 15 The difficult question "is to determine how much loss of autonomy a student must sustain and how much peril must be present to establish a special relationship." Webb, 2005 UT 80, ¶ 25, 125 P.3d 906. Webb itself answers this question. There, an earth sciences student participated in a field trip to a condominium project to examine fault lines. The course instructor directed the students to walk on icy and snowy sidewalks through the condominium project. One student slipped and pulled Webb down. The fall injured Webb. See id. ¶ 2.
¶ 16 Our supreme court held that the instructor's directive to walk on the icy sidewalk did not create a special relationship. See id. ¶ 27. "A directive received in connection with a college course assignment is an act that would engage the attention of the prudent student." Id. ¶ 26. Nevertheless, *320 the directive in Webb "did not relate directly to the academic enterprise of the class," but bore only a "tangential relationship to the field trip's academic mission." Id. ¶ 27. Thus, the court concluded, the instructor did not "exert the control which might be present in an academic setting to create a special relationship." Id. In other words, while the injured student might have relied on the course instructor's expertise in inspecting geologic features, he had no reason to rely on the course instructor's judgment with respect to navigating iey sidewalks. Thus, while Webb involved a directive given by a teacher to a student, no special relationship was created, because the directive was not given within the seope of the academic enterprise.
¶ 17 From this analysis we may extrapolate a general rule: a special relationship is created when (1) a directive is given to a student (2) by a teacher or coach (8) within the scope of the academic enterprise. See Webb v. University of Utah, 2005 UT 80, ¶¶ 23-27, 125 P.3d 906.[3] In contrast to Webb, the present case involves a directive given by an instructor to a student within the scope of the academic enterprise. Instructor told Cope and Partner, "'[Elither you guys do this or we are going to cut [the lift from the routine.] " Thus, like the students on the icy sidewalk in Webb, Cope and Partner "were directed" to do the lift. See id. ¶ 2. Of course, Cope was not compelled to proceed without spotters; she could have refused, attempted to negotiate for spotters, quit the dance team, or withdrawn from the university. But Webb does not require compulsion, merely a directive likely to evoke a reasonable student's "deference to [her teacher's] superior knowledge, skill, and experience." Id. ¶ 24. Instructor's statement was such a directive.
¶ 18 Moreover, unlike the directive in Webb, here the directive was given within the seope of the academic enterprise. Cope fell during a rehearsal of the UVSC Ballroom Danee Tour Team. In that context a student does have reason to rely on the dance-related directives of her instructor. Unlike the plaintiff in Webb, a student in this ciream-stance could be expected to "relinquish a measure of behavioral autonomy to [her] instructor out of deference to [his] superior knowledge, skill, and experience." See id. ¶ 24. She would reasonably believe that her instructor has "command of the subject matter and the environment in which it is taught." See id. ¶ 26. She would "understand that [her] academic success, measured . by the degree of knowledge [or skill] acquired ..., turned on whether [she] abandoned all internal signals of peril to take a particular potentially hazardous [action]." See id. ¶ 27. Thus, unlike in Webb, Instructor's directives to Cope did "relate directly to the academic enterprise of the class," and bore a direct, not tangential, relationship to the dance program's "academic mission." See id. It was "a directive received in connection with a college course assignment that would engage the attention of the prudent student" and thus was a "logical candidate" to induce detrimental reliance. See id. ¶ 26. In sum, every indicator of a special relationship absent from Webb is present here.[4]
¶ 19 Indeed, one factor not discussed in Webb is also present here. In Webb, the directive was a general one; the instructor *321 directed "Mr. Webb and other students" to walk on icy and snowy sidewalks. Id. ¶ 2. Here the directive was specific. Instructor "stopped the rehearsal [and] went to each couple to see where the timing issues were." When he reached Cope and Partner, he instructed them, by name, how to achieve the lift, and did so in terms clearly implying that the lift was safely achievable with a bit more effort: "(Copel, you just need to kick. [Partner}, you need to push more or lift more." In this cireumstance, it would be a rare student who refused to rely on the superior experience and expertise of her instructor.
¶ 20 It is true, as the dissent notes, that "Instructor told Cope and Partner only that they must practice the lift correctly, not that they must practice it without spotters." Infra ¶ 39. And based on this case-specific fact, the trier of fact may well determine that Instructor did not breach the duty of care that he owed Cope in this cireumstance. Insofar as whether a duty existed, however, Webb makes clear that the distinction between acts and omissions is not dispositive: "a special relationship relating to a governmental actor can result in the imposition of liability for either her acts or her failure to act." Webb, 2005 UT 80, ¶ 13, 125 P.3d 906. It follows that, here, Cope "stand[s] so far apart from the general public"-and indeed, so far apart from the other students. in the class-"that we can describe [her] as having a special relationship to the governmental actor." See id. ¶ 11.
¶ 21 This conclusion is consonant with Utah case law. For example, in Beach v. University of Utah, 726 P.2d 413 (Utah 1986), our supreme court rejected the claim that a university owed a duty of care to supervise a student who fell from a cliff at night during a field trip sponsored by the university. See id. at 414. The Beach court concluded that the student's "situation was not distinguishable from that of the other students on the trip" and thus the instructor had no duty to "walk [her] to her tent and see that she was down for the night." Id. at 416. Here, Cope's situation was distinguishable from that of the other students on the UVSC Ballroom Dance Tour Team.
¶ 22 Similarly, in Orr v. Brigham Young University, 960 F.Supp. 1522 (D.Utah 1994), aff'd without published opinion, 108 F.3d 1388 (10th Cir.1997), a Utah federal district court applied Utah law in determining whether a private university owed an injured football player an affirmative duty of care. The court rejected the player's claim of "a special relationship with the university by virtue of his football player status." Id. at 1529. Specifically, the court rejected the football player's claim that, "by playing football for BYU, he became in essence a ward of the university without any vestige of free will or independence." Id. at 1528.[5] The court relied on the distinction between "'a large undifferentiated group, such as a university student body,' " and " 'narrow classes of individuals who for some reason were distinguishable from the mass." Id. (quoting Higgins v. Salt Lake County, 855 P.2d 231, 236-37 (Utah 1998)). Although the court found no special relationship that would create a duty to act, the court acknowledged that "when training ... services are provided and then negligently performed, liability could result under existing theories of negligence." Id.[6] Here, Cope does not claim that by dane-ing on the UVSC Ballroom Danee Tour Team she became in essence a ward of the university; rather, she alleges that she was injured when training services were being provided in such a way as to create a special relationship. See Webb v. University of Utah, 2005 UT 80, ¶¶ 14, 16, 125 P.3d 906 {noting that the commission of an affirmative act by a governmental actor does not create a duty by itself, "but instead provides relevant information about whether a special relationship existed between the governmental actor and the injured party").
¶ 23 UVSC cites several cases holding that a duty of reasonable care arises only when a coach or instructor increases the risk of harm beyond that inherent in an activity. *322 See, e.g., Bushnell v. Japanese Am. Religious & Cultural Ctr., 48 Cal.App.4th 525, 50 Cal.Rptr.2d 671, 673-74 (1996) (holding that a judo student could recover only for an instructor's reckless or intentional conduct, noting that duty sounding in negligence extended only to an instructor's actions that increase the risk inherent in the activity); Crace v. Kent State Univ., 2009-Ohio-6898, ¶¶ 13-15, 185 Ohio App.3d 534, 924 N.E.2d 906 (applying same standard to a university cheerleading instructor). However, the existence of a duty and the appropriate standard of care are two distinct questions. See Madsen v. Borthick, 850 P.2d 442, 444 (Utah 1993) ("In establishing the existence of a duty, the same analysis is used for both a negligence and a gross negligence claim. The difference between the two lies in the degree of care to which the defendant is held."). We believe the concerns raised in the cases cited by UVSC are best addressed by adopting an ordinary standard of reasonable care. See Kahn v. East Side Union High Sch. Dist., 31 Cal.4th 990, 4 Cal.Rptr.3d 103, 75 P.3d 30, 51-52 (2003) (Kennard, J., concurring and dissenting) (stating that the risk of harm inherent in active sports could be accounted for by holding high school coaches to a standard of ordinary care).
¶ 24 A duty of reasonable care generally encompasses a duty not to create an unreasonable risk of harm. See Reighard v. Yates, 2012 UT 45, ¶¶ 29-31, 285 P.3d 1168; B.R. ex rel. Jeffs v. West, 2012 UT 11, ¶ 21 & n. 11, 275 P.3d 228. What may be reasonable in one setting may not be reasonable in another. Ordinarily participants cannot reasonably expect instructors or coaches to insulate them from risks inherent in an activity in which they voluntarily engage. See, e.g., Kahn, 31 Cal.4th 990, 4 Cal.Rptr.3d 103, 75 P.3d at 38-43 (majority opinion). But whether, under the cireumstances of this case, Instructor created an unreasonable risk of harm, increased the risk inherent in competitive ballroom dancing, or was otherwise unreasonable in his acts and omissions is a question for the trier of fact.
¶ 25 UVSC also argues that policy considerations weigh against imposing a duty of care on coaches of physically strenuous activities. If a duty of reasonable care is imposed, UVSC argues, instructors will hesitate to challenge participants to excel. See generally id. (holding that imposing a general duty of reasonable care would chill vigorous participation in sporting events). Such policy considerations are appropriate when considering whether a special relationship exists. See Higgins, 855 P.2d at 236-37. Courts must consider "the practical impact that finding a special relationship would have," including whether the duty is "realistically incapable of performance or fundamentally at odds with the nature of the parties' relationship." Id. at 237; Beach, 726 P.2d at 418.
¶ 26 We do not believe our application of the duty outlined in Webb to the facts of this case is either incapable of performance or fundamentally at odds with the instructor-student relationship. Participants in sports or extra-curricular programs look to the instructor for direction as they acquire the skills needed to compete. They trust in the instructor's training, expertise, and appreciation of the risks involved. Participants expect instructors to challenge them to excel, but they also expect those instructors to act reasonably in doing so. Furthermore, the standard of reasonable care mitigates the policy concerns raised by UVSC: it leaves "coaches free to challenge or push their students to advance their skills level as long as they do so without exposing the student athletes to an unreasonable risk of harm." See Kahn, 31 Cal.4th 990, 4 Cal.Rptr.3d 103, 75 P.3d at 52 (Kennard, J., concurring and dissenting).
¶ 27 We conclude that the undisputed facts in this case establish the existence of a special relationship and thus a duty of reasonable care on the part of Instructor. We caution that the existence of this duty does not resolve questions of breach and proximate cause. Whether the risks involved for these particular dancers in performing this particular lift without spotters would cause a reasonable dance instructor to take particular precautions to protect Cope from a fall is a question of breach. And, if Instructor failed to act reasonably in this regard, whether that failure proximately caused Cope's fall *323 and injuries is a question of causation. See Jeffs, 2012 UT 11, ¶ 26, 275 P.3d 228. "Both of those questions are case-specific and fact-intensive, and they are not before us on this appeal." Id. ¶ 28.
CONCLUSION
¶ 28 Because the trial court's denial of UVSC's first motion for summary judgment was not a final order, the trial court did not abuse its discretion by reconsidering and revising it. Because the facts, considered in the light most favorable to Cope, establish a special relationship, the trial court erred in granting UVSC's renewed motion for summary judgment. We therefore affirm in part and reverse in part and remand for further proceedings.
¶ 29 I CONCUR: MICHELE M. CHRISTIANSEN, Judge.

. UVSC is now known as Utah Valley University. However, we refer to it by its name at the time of the incident.

. The expert explained that learning a lift that is similar to one previously learned is often more difficult than a completely different lift because of the muscle memory associated with the similar lift.

. As the dissent notes, Webb engaged in an extensive analysis of the balance between the risk involved in a situation and the control exerted by a teacher. See Webb v. University of Utah, 2005 UT 80, ¶¶ 23-27, 125 P.3d 906. But we do not believe Webb requires courts to apply this same balancing test for every case in which a student asserts a breach of duty by university personnel. The rule arising out of Webb is a product of its balancing of the risk and control factors.

, We do not believe Webb requires that a student have "abandoned a/f internal signals of peril." Webb, 2005 UT 80, ¶ 27, 125 P.3d 906 (emphasis added). Although this phrase appears in Webb, other passages in Webb suggest the question is one of degree. See, e.g., id. ¶ 24 ("The hypothetical possibility that a special relationship can be created between an instructor and a student in a higher education setting flows from the fundamental reality that ... a college student will inevitably relinquish a measure of behavioral autonomy to an instructor...." (emphasis added)); id. ¶ 25 ('The harder question is to determine how much loss of autonomy a student must sustain and how much peril must be present to establish a special relationship." (emphasis added)); id. ¶ 27 (rejecting the claim of a special relationship where "[the instructor did not ... exert the control which might be present in an academic setting").

. We read the court's opinion as attributing this hyperbole to the plaintiff in the case; it does not state the legal test in Utah.

. The court did not explain this reference to "existing theories of negligence." See Orr v. Brigham Young Univ., 960 F.Supp. 1522, 1528 (D. Utah 1994).