**2021 UT 43**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

CHRISTINA ROSSI,
*Appellant,*

*v.*

UNIVERSITY OF UTAH,
*Appellee.*

No. 20180549
Heard November 17, 2020
Filed August 12, 2021

On Direct Appeal

Third District, Salt Lake
The Honorable Royal I. Hansen
No. 160905414

Attorneys:

Ryan B. Hancey, Adam L. Grundvig, Salt Lake City, for appellant

Peggy E. Stone, Asst. Solic. Gen., Sean D. Reyes, Att'y Gen.,
Salt Lake City, for appellee

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court
in which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS,
JUSTICE PETERSEN, and JUDGE WILCOX joined.

Having recused himself, JUSTICE PEARCE does not participate
herein; JUDGE JEFFREY C. WILCOX sat.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

## INTRODUCTION

¶1 Christina Rossi was dismissed from the University of Utah's Neuroscience Ph.D. Program (the University). She asserted claims against the University for breach of contract, breach of the covenant of good faith and fair dealing, and negligence. The district court dismissed all three claims on summary judgment. We affirm.

¶2 We acknowledge that a student may establish that a university has made promises to students that are legally enforceable under the law of contracts. But we hold that Rossi failed to establish a basis for concluding that there was a breach of any such promise by the University of Utah—a promise made in exchange for a promise or performance by Rossi.

¶3 We affirm the dismissal of Rossi's breach of contract claims on this basis. Because her contract claims fail, we also hold that she has no viable claim for breach of the covenant of good faith and fair dealing. And we reject her negligence claim on the basis of our refusal to establish a fiduciary duty of educators to students.

## BACKGROUND

¶4 In 2008 the University of Utah accepted Christina Rossi as a Ph.D. student in its Interdepartmental Program in Neuroscience. Upon accepting her, the university sent Rossi an acceptance packet that included a program Policy Statement and an Academic Policies and Procedures Guide—documents that described academic standards for students in the program and set forth procedures for addressing a student's failure to meet such standards.

¶5 In Rossi's first year in the program she enrolled in required courses and began to conduct research under the supervision of an assigned mentor. Initially, Rossi's research was performed under the supervision of Dr. Raymond Kesner. Rossi and Kesner signed a document—an Association of Medical Colleges (AAMC) "Compact Between Biomedical Graduate Students and Their Advisors"—memorializing certain expectations for their mentoring relationship. She also began to form her dissertation supervisory committee (the Committee), which included Dr. Kesner and Drs. F. Edward Dudek, Kristin Keefe, John White, and Bradley Greger.

¶6 Dr. Dudek took over the role as Rossi's mentor during her second year. During that year, Dr. Dudek encouraged Rossi to collect data for her project using a device called the "Epoch." Rossi was aware that Dr. Dudek had an ownership interest in the company that manufactured the device, but claims she did not know the extent of his interest.

¶7 In September 2012, Rossi met with the Committee to discuss her progress. They selected June 2013 as the anticipated date for Rossi to defend her dissertation.

¶8 According to Rossi, her relationship with the Committee began to sour around November 2012. At that point, Rossi told Dr. Dudek that her research had not produced the results she had expected. At that time, Dr. Dudek sent a letter identifying the possibility of conflicts of interest based on his ownership in the manufacturer of the Epoch. He stated that the University did not want Rossi to feel "pressured" to make the Epoch and the data provided appear "better than they actually [were]." Dr. Dudek identified several plans to manage the conflicts, but Rossi asserts that no University representatives followed the plans in the letter.

¶9 Rossi alleges that Dr. Dudek did not make himself available to discuss her dissertation after this point. In March 2013, however, Dr. Dudek approved an April 25 date for Rossi to defend her dissertation. Dr. Dudek and Rossi met to discuss her dissertation on April 15. At that time, Rossi believed that Dr. Dudek was happy with her work. The next day, however, Dr. Dudek encouraged Rossi to postpone both her defense date and her upcoming postdoctoral fellowship at MIT. Three days before her dissertation defense, Dr. Dudek met with Rossi and informed her that he "did not trust her" because she had been "dishonest." He also told Rossi she could no longer be in his lab unless escorted.

¶10 After Rossi's defense, Dr. Dudek told the Committee, people in his lab, University faculty, and the University's research integrity officer that he believed that Rossi had been dishonest, misleading, untrustworthy, and lazy. He also asserted that she had committed "research misconduct" and other misconduct, including falsifying her data.

¶11 After Rossi's defense, the Committee unanimously determined that she did not fully analyze her data and that her written dissertation lacked the level of completeness and detail required for a Ph.D. The Committee gave Rossi a second chance to defend her dissertation, however. At least one of the grounds for doing so was Rossi's assertion that Dr. Dudek had not been available or given her adequate support in the months leading up to her defense.

¶12 From April 2013 until January 2014, Rossi communicated with the Committee, and the Committee members regularly consulted each other as they reviewed Rossi's work. They provided feedback regarding proposed drafts and sections of her dissertation and helped facilitate her research and data analysis.

¶13 The Committee met in July 2013, but then did not hear from Rossi again during the remainder of the summer. Dr. Keefe requested an update of her progress in September. Rossi then resumed submitting drafts of portions of her dissertation. But the Committee unanimously found that her drafts were inadequate and that she failed to incorporate the Committee members' suggestions in subsequent drafts.

¶14 At a November 2013 Committee meeting, the Committee determined that Rossi should be dismissed from the program and informed her of that decision. But the Committee reconsidered this decision the next day. It notified Rossi in writing that she was not dismissed and would be allowed to continue her project. The Committee sent her a Remediation Plan Letter, setting forth terms and conditions for Rossi to defend her dissertation in August 2014. The Remediation Plan Letter said that the Committee would reach out to Rossi by January 6, 2014 if she had "not made sufficient progress toward the completion of [her] dissertation," and would ask her "whether [she] wish[ed] to continue in the Interdepartmental Program in Neuroscience." If she did, the program would then "provide [her] with the next defined steps necessary to move, in their view, toward a successful dissertation document and oral defense in July/August."

¶15 Rossi responded by filing a grievance. Her grievance challenged the proposed remediation plan and stated that she wanted to graduate and defend her dissertation sooner. She also demanded office space, specific and written feedback, access to committee members, and for all committee meetings to be recorded. Neither the Committee nor the University accepted any of those requests. Yet Rossi alleges that she and the University acted bound by the Remediation Plan Letter despite her grievance.

¶16 Rossi did not meet the deadlines set out in the Remediation Plan Letter. She repeatedly requested extensions of time. In the Committee's view, Rossi's work did not improve. On January 14, 2014, the Committee sent Rossi a letter informing her she was dismissed from the program. The Committee's decision was affirmed at every level of administrative review at the University, including appeals and review by the Program Chair, the Dean of the School of Medicine, the Graduate School Vice President, the Academic Appeal committee, and the University's Vice President.

¶17 Rossi asserted claims against the University for breach of contract, breach of the covenant of good faith and fair dealing, and negligence. Her breach of contract claims alleged that the University had breached the terms of a contract established in various documents memorializing her status or relationship in the University or the program—a policy set forth in a University Student Code, the terms of a Faculty Code and Conflict of Interest Policy and Research Misconduct Policy, and the standards set forth in the Program Policy Statement, AAMC Compact, and the Remediation Plan Letter. Rossi also asserted that the University had breached a covenant of good faith and fair dealing inherent in these alleged contracts. And she claimed that the University had an independent duty in tort that it breached in dismissing her from the program.

¶18 The district court dismissed all of these claims on summary judgment. In dismissing the contract claims, the court noted that the Utah appellate courts had not yet decided whether a contractual relationship exists between a university and its students "based solely on a university's policies and procedures, rules, or student manual." In the absence of Utah-specific authority, the district court turned to precedent in other jurisdictions. First, the court endorsed a statement from the Tenth Circuit Court of Appeals suggesting that contract law may not be "rigidly applied in all its aspects" in a university setting. *See Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir. 1975). Second, the court found "persuasive a line of cases from the Southern District of New York"—cases stating that "general policy statements and broad and unspecified procedures and guidelines" will not sustain a claim for breach of contract against a university, *see Ward v. New York Univ.*, No. 99 CIV. 8733 (RCC), 2000 WL 1448641, at *10 (S.D.N.Y. Sept. 28, 2000), and holding that a plaintiff asserting a claim for breach of contract based on university policies and procedures "must identify specifically designated and discrete promises" in university materials, *see Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (citation and internal quotation marks omitted).

¶19 The district court applied this standard in concluding that each of Rossi's breach of contract claims failed as a matter of law. It also dismissed the good faith and fair dealing claim, holding that Rossi could not "resort to the implied covenant as a means to revive any of the remaining bases for her breach of contract claim," or to establish either "new, independent rights or duties" that the parties had not agreed to, *see Oakwood Vill. LLC v.*

*Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226, or "obligations inconsistent with express contractual terms," *see Snow v. Chartway Fed. Credit Union*, 2013 UT App 175, ¶ 7, 306 P.3d 868 (citation omitted). Finally, the district court dismissed the negligence claim on the ground that a university has no tort-based duty to provide an education in accordance with a professional standard of instruction.

¶20 Rossi filed a motion to alter or amend the judgment. The district court heard argument on that motion, but Rossi filed a notice of appeal before the district court had ruled. The court of appeals stayed the appeal pending a district court ruling on the pending motion. The district court thereafter denied the motion (in an order not challenged by Rossi).

¶21 Rossi's appeal then resumed in the Utah Appellate Court. In considering the resumption of the case, it was decided that the case would be recalled by this Court.

**STANDARD OF REVIEW**

¶22 We review the district court's decision on summary judgment *de novo*, yielding no deference to its analysis. *See Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56. And we affirm the dismissal of each of Rossi's claims. In so doing we clarify the governing standard for assessing a breach of contract claim in this setting, and explain how that standard affects Rossi's claims for breach of the covenant of good faith and fair dealing and for breach of a tort-based duty of care.

**ANALYSIS**

**I. BREACH OF CONTRACT**

¶23 We agree with a core premise of the district court's analysis of Rossi's claims for breach of contract. Not every assurance or statement made in a university setting can be taken as a term of a contract enforceable under the law.

¶24 We disagree, however, with the need or basis for a university-specific standard of contract law. The controlling standards, in our view, do not stem from a requirement of specificity or discreteness that is somehow unique to universities. They flow from a general principle of contract law—the notion that the operative terms of an enforceable contract are the terms of a bargained-for exchange between the university and its students. Such terms may be manifested by express language or by implication from course of dealing or traditional practice. But the

key question is whether an alleged assurance by a university is the articulation of a legally enforceable "promise" made in exchange for a promise or performance by a student (such as payment of tuition or other means of qualifying for enrollment).

¶25 In so concluding, we reject Rossi's request that we establish a blanket rule that treats the relationship between a university and its students generally as a contractual one, defined by the terms and conditions of all university policies and similar documents. Admittedly, our opinion in *University of Utah v. Shurtleff*, 2006 UT 51, 144 P.3d 1109, made reference to the possibility of a "contractual or quasi-contractual relationship[]" between a university and its "students and employees" arising under a firearms policy. *Id.* ¶¶ 26, 28. But in so stating we were not establishing that any particular terms of that policy were enforceable in the law of contract—much less that all university policies are contractual. We were simply holding that the firearms policy in question was not a "legislative" enactment that ran afoul of a state statute prohibiting a "local authority or state entity" from adopting a policy restricting the "possession or use of firearms on either public or private property." *Id.* ¶ 11 (citing UTAH CODE § 63-98-102(5) (2004) (current version at *id.* § 53-5a-102(5)). And the *Shurtleff* case accordingly does not establish a general rule that deems all formal university policies to form the basis of a contractual relationship between a university and its students.

¶26 We do not foreclose the possibility that a university policy or other document may establish the basis of an enforceable contract with students or others in the university community. In fact, we expressly acknowledge that a university likely does have a contractual relationship with its students to some degree. *See infra* ¶ 38. Our holding is thus more limited. We simply reject the notion of a blanket rule establishing that all formal university documents are enforceable in contract. And we hold that the question of the enforceability of any university document under the law of contract depends on whether the terms of the document can be shown to amount to a legally enforceable promise made in exchange for a promise or performance by a student.

¶27 As the plaintiff in this matter, Rossi bears the burden of coming forward with evidence to support each of the elements of her claims for breach of contract. We conclude that she has failed to carry that burden. And on that basis we also reject her assertion that the determination of the terms of any enforceable contract

must turn on questions of fact that are not properly resolved on summary judgment. This may sometimes be true. But the burden of production on summary judgment follows the burden of proof. *See Salo v. Tyler*, 2018 UT 7, ¶ 30, 417 P.3d 581. And Rossi accordingly bears the burden of producing "a legally sufficient evidentiary basis" on each "element" of her claims. *See id.* (citing UTAH R. CIV. P. 50(a)(1)). We conclude that the University is entitled to judgment as a matter of law because Rossi failed to carry the burden of producing evidence sufficient to establish that the University breached the terms of any legally enforceable contract.

¶28 We develop the grounds for our breach of contract framework in the paragraphs below. We then apply that framework to each of Rossi's claims for breach of contract.

*A. Promises and Bargained-For Exchanges*

¶29 "A contract is a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RESTATEMENT (SECOND) OF CONTRACTS § 1 (AM. L. INST. 1981). A key element of a contract is thus the existence of a legally enforceable "promise" or set of promises. In contract law, a "promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Id.* § 2(1). "A promisor manifests an intention if he believes or has reason to believe that the promisee will infer" the promisor's intention to act or refrain from acting based on the promisor's "words or conduct." *Id.* § 2 cmt. b.

¶30 "A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct." *Id.* § 4. Thus, an "intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance." *Id.* § 4 cmt. a.

¶31 Not all promises are enforceable under the law of contracts. Generally, a promise is legally enforceable where it is part of "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Id.* § 17(1). An enforceable contract thus consists of the terms of a bargained-for exchange between the parties. And the terms of the bargain are

defined by the meeting of the minds of the parties—through an offer and acceptance upon consideration.[1]

¶32 "A bargain is an agreement to exchange promises or to exchange a promise for a performance or to exchange performances." *Id.* § 3. Ordinarily, a bargain is "made by an offer by one party and an acceptance by the other party or parties, the offer specifying the two subjects of exchange to which the offeror is manifesting assent." *Id.* § 3 cmt. d. The offer and acceptance, in other words, must have "reference" to each other. *Id.* § 23. The terms of the promise or promises must be a matter of mutual assent upon a bargained-for exchange—typically, one party's statement of "what he will do and what he requires in exchange" will be followed by the other party's assent to those terms. *Id.* § 22 cmt. a.[2]

¶33 The terms of the bargained-for exchange must be reflected in a manifestation of the parties' assent. *See id.* § 18. But as with the promise itself, assent to the terms of the exchange may be made through "written or spoken words or by other acts or by failure to act." *Id.* § 19(1). In some circumstances and in some settings, the lack of assent will be made clear. For either "words" or "non-verbal conduct," however, there may sometimes be doubt about whether there has been a manifestation of assent. *See id.* § 19 cmt. a (noting that words or conduct may have "different meanings to different people").[3]

---

[1] *See Aquagen Int'l, Inc. v. Calrae Tr.*, 972 P.2d 411, 413 (Utah 1998) ("The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.") (citation and internal quotation marks omitted); *John Call Eng'g, Inc. v. Manti City Corp.*, 743 P.2d 1205, 1207 (Utah 1987) ("[I]t is a basic principle of contract law that there can be no contract without the mutual assent of the parties.").

[2] *See Aquagen Int'l*, 972 P.2d at 413 ("Consideration sufficient to support the formation of a contract requires that a performance or a return promise must be bargained for.") (citation and internal quotation marks omitted).

[3] *See Rapp v. Salt Lake City*, 527 P.2d 651, 654 (Utah 1974) (holding that mutual assent may be manifested by "words or actions or both" (citation omitted)).

¶34 Any such doubt again may be resolved in light of any relevant course of dealing, usage of trade, or course of performance.[4] Assent may be found if in the relevant circumstances, a party would "know[] or ha[ve] reason to know that the other party may infer" from his words or conduct that "he assents" to the terms of the deal. *Id.* § 19(2). The converse also holds. There is no assent (and thus no bargained-for exchange) if there is no basis for a conclusion that the other party would know or have reason to know that the other party may infer a basis for assent to the terms of a bargained-for exchange.

¶35 The parties to an exchange may choose to specify that their promises "shall not affect legal relations"—as in a disclaimer that a given document "is not to be a legal agreement or subject to legal jurisdiction in the law courts." *Id.* § 21 & cmt. b. That kind of statement should be carefully scrutinized but is given effect. It "may mean that no bargain has been reached, or that a particular manifestation of intention is not a promise" that is enforceable under the law of contracts. *Id.* § 21 cmt. b.[5]

### B. Rossi's Claims

¶36 The above framework sets the stage for the inquiry into the terms of any alleged contract between a university and its students. Not every assurance or statement made by a university can be viewed as a term of a legally enforceable contract. To qualify as such a term, the university's statement would have to be a "promise" made in a "bargain" in exchange for a promise or performance by students. And the promise would be enforceable in contract only if the university and the students "assented" to

---

[4] *See Hector, Inc. v. United Sav. & Loan Ass'n*, 741 P.2d 542, 546 (Utah 1987) ("Course of dealing or industry usage and custom is admissible evidence to construe ambiguous terms of an agreement or to supply missing terms in an otherwise valid agreement, at least under certain circumstances; but evidence of a course of dealing and industry usage and custom does not suffice to create a whole agreement. . . ." (citation omitted)).

[5] *See Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991) (holding that there was no contract based on an employee handbook where the handbook disclaimed intent to form a contract).

the terms of the bargain and did not disclaim the prospect of its resolution by courts of law.

¶37 Any of these inquiries may be resolved by the express language of the parties. And where such language is unclear, any ambiguities may be resolved by reference to a course of dealing or established practice in a university community.

¶38 Established practice likely would sustain a basis for an enforceable contract between a university and its students on at least some points. It seems clear, for example, that the university promises to provide the means to enroll in classes and to qualify for a degree in exchange for student payment of tuition (or qualification for a scholarship). And presumably the university would be subject to suit for breach of contract if it accepted payment of tuition and refused to allow a student to enroll in classes. *See Vought v. Tchrs. Coll., Columbia Univ.*, 127 A.D.2d 654, 654–55 (N.Y. App. Div. 1987) (stating that admission of a student establishes a basis for concluding that there is a contract that "states that if the student complies with the terms prescribed by the university, he will obtain the degree he seeks").

¶39 Yet not every express statement or promise can be viewed as a term of a bargained-for exchange to be enforced in a court of law. A university's promise will not be enforceable in contract if it is not made in exchange for a student's performance or promise, or where the university openly states that its promise is not subject to the jurisdiction of the courts. And many informal, day-to-day assurances by university personnel may be viewed (in light of established practice) as falling outside the realm of the law of contracts.

¶40 We consider Rossi's claims for breach of contract under these standards. And we affirm the dismissal of each of her claims on the grounds that she has failed to identify a genuine issue of material fact and the University is entitled to judgment as a matter of law.

### 1. The Student Code

¶41 Rossi first asserts a claim for breach of contract arising under Policy 6-400, also known as the Student Code. The Student Code is an element of the University's General Catalog. Because the Catalog and Code were made available to students upon enrollment and set forth specific assurances made by the University, Rossi claims that these assurances are enforceable

promises under the law of contract. And she asserts that the University breached the contract in various ways.

¶42 Rossi points to certain "rights" specified in Policy 6-400 of the Student Code: (1) "a right to support and assistance from the University in maintaining a climate conducive to thinking and learning"; (2) "a right to due process in any proceeding involving the possibility of substantial sanctions . . . includ[ing] a right to be heard, a right to decision and review by impartial persons or bodies, and a right to adequate notice"; and (3) "a right to be treated with courtesy and respect." And Rossi claims that the University breached its contract by failing to provide her adequate due process, by failing to provide support in "maintaining a climate conducive to thinking and learning," and by violating her right "to be treated with courtesy and respect."

¶43 Rossi asserts that there are disputed questions of fact as to whether and to what extent the University lived up to the standards set forth in the Student Code. And she insists that she is entitled to a remand to allow her to develop and present her breach of contract claim at a trial on the merits.

¶44 We disagree and affirm. Rossi's Student Code claim fails as a matter of law because she has failed to establish a basis for concluding that the terms of Policy 6-400 were assented to by the parties as an element of an enforceable, bargained-for exchange. Conceivably, a university catalog could be viewed to establish the elements of an enforceable contract between a university and its students. But the terms of such a catalog are controlling. And here there is no enforceable contract because the catalog expressly states it "is not a contract between the University of Utah and any person or entity."[6]

¶45 That is fatal to Rossi's first claim for breach of contract. As noted above, the parties to a contract may expressly state their understanding that a given promise is not to be treated as a subject of a bargained-for exchange to be enforced in the courts of law. *See* RESTATEMENT (SECOND) OF CONTRACTS § 21 & cmt. b. (AM.

---

[6] Rossi challenges this conclusion in her reply brief, asserting that the Policy 6-400 terms that she relies on are somehow distinct from the Policy-6-400 terms set forth in the Student Code incorporated in the General Handbook. But the terms of the two provisions are identical. And Rossi's argument accordingly fails.

L. I<small>NST</small>. 1981); *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991) (holding that "clear and conspicuous language disclaiming any contractual liability" prevents the formation of a contract). Because the catalog clearly and expressly disclaims the existence of an enforceable contract, it cannot be cited as a basis for a claim for breach of contract.

### 2. Faculty Code and Conflict of Interest Policy

¶46 Rossi next asserts breach of contract claims under the terms of the Faculty Code and the Conflict of Interest Policy. These documents regulate aspects of the relationship between the University and its faculty. The Faculty Code requires faculty to conduct themselves "in accordance with reasonable standards of professionalism" and to "maintain regular office hours." It also prohibits "intentional neglect" by faculty of "necessary communications." The Conflict of Interest Policy prescribes procedures for disclosure and management of activities resulting in a conflict of interest.

¶47 Rossi asserts that the University failed to satisfy the terms and conditions of these documents and thereby affected her standing as a Ph.D. student. She alleges that Dr. Dudek neglected "necessary communications" with her and failed to conduct himself in accordance with reasonable standards of professionalism. She also contends that the University failed to follow the procedures for management of Dr. Dudek's conflict of interest in his involvement with research involving the Epoch device. And she again asserts that the district court erred in dismissing these claims as a matter of law.

¶48 Again we disagree and affirm. Rossi has failed to identify a basis in the record for concluding that the terms of the Faculty Code or Conflict of Interest Policy were assented to as the terms of a bargained-for exchange between the University and its students. These documents on their face are aimed only at regulating the relationship between the University and its faculty.

¶49 Rossi does not argue the contrary. At most she claims that she was an intended third-party beneficiary of these contracts. But that argument fails as a matter of law. To have a right to sue as an intended third-party beneficiary, Rossi would have to establish that the Faculty Code and Conflict of Interest Policy were "undertaken for [her] direct benefit" in contract terms that "affirmatively make this intention clear." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 47, 28 P.3d 669 (citation and internal quotation marks omitted). Neither

of these documents has any terms that make such intention clear. At most, they make references to students as incidental beneficiaries of policies governing faculty. That is insufficient. And Rossi accordingly is in no position to assert a claim for breach of contract under these documents.

### 3. Research Misconduct Policy

¶50 Rossi next turns to the terms of the Research Misconduct Policy—a document that expressly states that it "applies to any university employee, faculty, *student*, staff or other individual who participates in" a "research project" (emphasis added). Rossi notes that she was involved as a student in a University research project. And she alleges that the University breached the terms of the Research Misconduct Policy in its response to a "written complaint" by Dr. Dudek alleging that she had engaged in "misconduct" in her research. Among other things, Rossi alleges that the University failed to fulfill the requirement in the Research Misconduct Policy to "undertake diligent efforts, as appropriate, to restore the reputations of persons alleged to have engaged in misconduct when such allegations are not confirmed, and to protect the positions and reputations of those persons who, in good faith, report apparent misconduct."

¶51 Rossi asserts that the misconduct allegations against her were "not confirmed." She claims that the University thus had a legally enforceable duty to "undertake diligent efforts . . . to restore" her reputation. And she accordingly contends that the district court erred in dismissing her claim for breach of contract as a matter of law.

¶52 We again disagree. As the plaintiff on this breach of contract claim, Rossi bore the burden of coming forward with evidence not just of the terms of the Research Misconduct Policy, but of a basis for concluding that such terms were elements of a bargained-for exchange between the University and its students. This she failed to do.

¶53 Rossi points to no language in the Research Misconduct Policy that suggests that the standards it states are promises made by the University in exchange for a promise or performance by students. She likewise fails to identify any basis in any established practice or course of performance for treating the terms of this document as the elements of a legally enforceable exchange.

¶54 The document, in fact, points against such conclusion. Nowhere does the document refer to any promise or performance

by students in exchange for the procedures prescribed by the University. And nowhere is there a "reference" connecting any such student promise or performance to the University's standards. RESTATEMENT (SECOND) OF CONTRACTS § 3 (AM. L. INST. 1981) (providing that a "bargain" requires "an agreement to exchange promises or to exchange a promise for a performance or to exchange performances"); *id.* § 23 (noting that there is assent to an exchange where an offer and acceptance have "reference" to each other).

¶55 The Research Misconduct Policy reads as an internal operating manual for resolution of misconduct through procedures within the University community. There is no indication of a legally enforceable, bargained-for exchange. The University is agreeing to follow certain procedures internally and to "undertake diligent efforts, as appropriate." But Rossi has identified no basis for treating the University's assurances as a basis for a legally enforceable contract. We affirm on that basis.

### 4. Policy Statement

¶56 Rossi also asserts a claim for breach of contract under a Policy Statement on Academic Standards of the Neuroscience Program. This document prescribes certain requirements for students in the Neuroscience Program. It also outlines procedures for Program faculty or officials to follow in the event of "failure to meet academic standards" or of "academic misconduct."

¶57 Rossi claims that she was dismissed from the Program for academic misconduct but not afforded the process required under the Policy Statement. She asserts that there are at least disputes of fact on the basis for her dismissal. And she again contends that the district court erred in dismissing her claim as a matter of law.

¶58 We disagree and affirm. The Policy Statement claim fails for the same reasons that the Research Misconduct Policy claim fails. Rossi has failed to identify a basis for concluding that the terms of the Policy Statement are the elements of a legally enforceable, bargained-for exchange. Again she has identified nothing in the language of the Policy Statement or in any established practice for concluding that this was anything other than an internal operating manual.

¶59 The Policy Statement, if anything, cuts the other way. It makes no mention of any student promise or performance provided in exchange for the procedures set forth in the document. And it expressly reserves discretion for Program

officials and provides for resolution through a dispute-resolution system operating within the University community—with roles for the Program Director, the Curriculum Committee, the Dean of the Graduate School, and an Academic Appeals and Misconduct Committee.

¶60 Rossi has identified no basis for concluding that the Policy Statement established the terms of an enforceable contract. And her claim under this document was properly dismissed as a matter of law.

## 5. AAMC Compact

¶61 Rossi asserts another breach of contract claim under a "Compact" she and Dr. Kesner signed during a period in which Kesner was her faculty mentor. The Compact is a document prepared by the AAMC. It identifies certain expectations of a faculty mentor, such as providing "an environment that is intellectually stimulating, emotionally supportive, safe, and free of harassment"; meeting "one-on-one" with the student "on a regular basis"; avoiding conflicts of interest that could "interfere" with the student's research; compliance with "appropriate disclosure policies regarding possible financial interests in organizations that may have substantial fiscal relationship with the University"; and providing 15-days' written notice of any intent to discharge a student from a research lab.

¶62 This document admittedly might appear to come closer to establishing the terms of an enforceable bargained-for exchange with a student. The Compact states that "[a] successful student-mentor relationship requires commitment from the student, mentor, graduate program, and institution." And it identifies responsibilities not just of the mentor but also of students.

¶63 It is by no means obvious, however, that this is a document that establishes the terms of a bargained-for exchange between mentors and students. The Compact nowhere says that the mentor's promises are being offered in exchange for the student's performance or promises. And the document expressly states that it is aimed at "offer[ing] a set of broad guidelines which are meant to initiate discussions at the local and national levels about the student-mentor relationship."

¶64 If the question were squarely presented to us, we might be inclined to conclude that a document like this does not establish the terms of a bargained-for exchange without some showing of an established practice of treating it as such. We need

not and do not reach that question here, however, because Rossi's claim fails on a threshold basis.

¶65 Rossi's claim for breach is rooted in alleged failures of *Dr. Dudek* to abide by the terms of the Compact. And she has established only that Dr. Kesner (not Dr. Dudek) signed the Compact.

¶66 Rossi has identified no basis for holding Dr. Dudek to a document he did not sign. And we conclude that her claim for breach of the Compact fails as a matter of law on that basis.

6. Remediation Plan Letter

¶67 Rossi last asserts that the University breached a contract established by the terms of a Remediation Plan Letter sent by her dissertation committee on November 22, 2013. The letter conveyed the Committee's concern that Rossi's "current performance" had fallen short of the "standard of scientific rigor and thoughtfulness required for successful completion" of a Ph.D. But it invited her to "significantly increase" the "intellectual rigor evident in all aspects of [her] dissertation work." And it offered to allow her to present a "second defense" of her dissertation by August 25, 2014, under "expectations and deadlines" set forth in the letter.

¶68 Rossi alleges a breach of contract in the failure of Program officials to follow through on the terms of this Remediation Plan Letter. She notes that the University dismissed her from the Program in a letter dated January 14, 2014. And she asserts that such dismissal was a breach of the terms offered in the Remediation Plan Letter.

¶69 We need not decide whether the Remediation Plan Letter set forth the terms of an offer to enter into a legally enforceable contract because Rossi rejected that offer. She did so by responding to the Remediation Plan Letter by filing a grievance demanding an alternative timeline, office space, specific and written feedback, access to committee members, and that all committee meetings to be recorded. And that grievance took any offer off the table and foreclosed the establishment of a contract under the terms of the Remediation Plan Letter. *See Cal Wadsworth Constr. v. City of St. George*, 898 P.2d 1372, 1378 (Utah 1995) (noting that a "proposal of different terms from those of the offer constitutes a counteroffer, and no contract arises").

¶70 Rossi insists that her response could not have been a rejection of an offer because it was directed to two University

deans and not to the authors of the Remediation Plan Letter (Drs. Dudek and Keefe). We disagree. Rossi's breach of contract claim is asserted against the University. And University deans are agents of the University and thus in a position to decide whether to enter into a contract on its behalf—at least as much as the authors of the Remediation Plan Letter were. Rossi's grievance accordingly functioned as a rejection and counter-offer and foreclosed the formation of a contract based on an acceptance of its terms.

¶71 We affirm the dismissal of the breach of contract claim under the Remediation Plan Letter on this basis. We hold that the Remediation Plan Letter was at most an offer, which was not accepted by Rossi.

## II. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

¶72 We also affirm the dismissal of Rossi's claim for breach of the covenant of good faith and fair dealing. "Our cases have . . . chart[ed] a limited role" for this covenant. *Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 9, 266 P.3d 814. On one hand, we have established an inference that every contract carries a "duty to perform" it "in the good faith manner that the parties surely would have agreed to if they had foreseen and addressed the circumstance giving rise to their dispute." *Id.* ¶ 8. On the other hand, we have noted that "the judicial inference of contract terms is . . . fraught with peril, as its misuse threatens commercial certainty and breed[s] costly litigation." *Id.* (alteration in original) (citation and internal quotation marks omitted).

¶73 With these concerns in mind, we have carefully circumscribed the scope of the covenant of good faith and fair dealing. "First, we have recognized an implied duty that contracting parties refrain from actions that will intentionally destroy or injure the other party's right to receive the fruits of the contract." *Id.* ¶ 9 (citation and internal quotation marks omitted). Second, we have held that a court "may recognize a covenant of good faith and fair dealing where it is clear from the parties' 'course of dealings' or a settled custom or usage of trade that the parties undoubtedly would have agreed to the covenant if they had considered and addressed it." *Id.* ¶ 10 (citation omitted). "By enforcing these standards and limitations, our cases preserve the core role of the covenant of good faith while controlling against its misuse to the detriment of commercial security and reliance." *Id.*

¶74 Rossi's claim falls short under these standards. She has asserted that the University breached the covenant of good faith and fair dealing when it "used its discretion unreasonably, made it impossible for her to progress in her dissertation work, and otherwise deprived her of the fruits of the relationship." But she has nowhere connected this claim to the specific "fruits" of any particular provision of a contract with the university. Nor has she identified any basis for her claim in the parties' "course of dealings or settled custom or usage of trade." Instead, she has merely identified record evidence suggesting that the university acted unreasonably or unfairly in her view—evidence that she says that a "jury could rely on . . . even if the University did not breach any express policy or other part of the parties' contract."

¶75 This is insufficient under our law. *See id.* ¶ 12 (affirming dismissal of a claim for breach of the covenant in light of the plaintiff's failure to identify a basis for his claim under these standards). And we affirm the district court's judgment on this basis.[7]

### III. NEGLIGENCE

¶76 We also agree with the district court's grounds for dismissing Rossi's negligence claim. In advancing this claim, Rossi is asking us to establish either a fiduciary duty of educators to students or a duty based on a special relationship between educators and students.

---

[7] The district court's decision was rooted in part in the notion that the covenant of good faith and fair dealing cannot be used to establish "new, independent rights or duties" that the parties had not agreed upon. And as Rossi notes, this is an incorrect statement of our law as it now stands. *See Young Living Essential Oils, LC v. Marin*, 2011 UT 64, ¶ 10 n.4, 266 P.3d 814 (disavowing this language in our precedent, explaining that the prohibition is "against using the covenant to establish new rights or duties that are '*inconsistent with* express contractual terms,'" and explaining that the "covenant would be completely negated if it could never establish any independent rights not expressly agreed to by contract") (emphasis in original).

We thus reject the district court's analysis to the extent it was rooted in this now-disavowed principle. But we nonetheless affirm the dismissal of Rossi's claim for reasons set forth above.

¶77 We see no basis for such a duty. The professional responsibilities of faculty to students generally are established not by tort law but by other means. In a university setting, many of these responsibilities are set forth in formal or informal policies and procedures prescribed by the university and published to students. By tradition and established practice, a student who alleges that such policies or procedures were not followed is entitled to review through the internal processes of the university.

¶78 Rossi has identified no persuasive ground for overriding the above by imposition of a general duty of faculty to students. To date, the courts that have considered this question have generally declined to establish such a duty.[8] And we see no reason to reach a contrary conclusion.

¶79 In so stating, we are not concluding that no tort duty could ever arise in a university setting. A university official may have a duty to avoid an unreasonable risk of physical harm to students they interact with in certain circumstances. Our court of appeals established such a duty in *Cope v. Utah Valley State Coll.*, 2012 UT App 319, ¶¶ 17, 24, 290 P.3d 314, (holding that a college dance instructor had a "duty not to create an unreasonable risk of harm" in a circumstance in which the instructor specifically directed students to perform a dangerous lift in a dance routine after they had previously failed and fallen), *aff'd in part*, *rev'd in part*, 2014 UT 53, 342 P.3d 243. And we can see a plausible basis for upholding that kind of duty in a university setting.

---

[8] *See Rossi v. Univ. of Utah*, No. 2:15-CV-00767, 2016 WL 3570620, at *8 (D. Utah June 24, 2016) ("[T]he imposition of a fiduciary duty by a professor or mentor toward a graduate student has never been imposed by Utah statutory or case law."). *See also, e.g., Ernest v. Univ. of Phoenix*, No. 08-CV-2363-H (POR), 2010 WL 11508435, at *5 (S.D. Cal. July 27, 2010) ("The allegation that universities, university officials, directors, and professors have a fiduciary relationship to students because they extend guidance in shaping careers and provide direction to students does not give rise to a fiduciary duty." (citation and internal quotation marks omitted)); *Swenson v. Bender*, 764 N.W.2d 596, 602 (Minn. Ct. App. 2009) ("[T]he advisor-student relationship in the dissertation process is not a fiduciary relationship per se.").

¶80 In so concluding we are not expressly endorsing the duty established by the court of appeals in *Cope*. We sidestepped the issue previously in affirming the *Cope* decision on alternative grounds. *Cope*, 2014 UT 53, ¶ 39. And we again stop short of addressing the question here because it is unnecessary to our decision.

¶81 Rossi is not seeking to establish a duty of university officials to avoid an unreasonable risk of physical harm. She is seeking the imposition of a duty to do what is reasonably necessary to provide an effective educational experience. And we decline to establish such a duty for reasons set forth above.

## CONCLUSION

¶82 Christina Rossi has identified grounds for a legitimate difference of opinion on the wisdom or correctness of the University's decision to dismiss her from the Neuroscience Ph.D. program. But she has not identified a basis for a legal cause of action against the University. We affirm the dismissal of her claims for breach of contract, breach of the covenant of good faith and fair dealing, and negligence.

_____